14-1466 and 14-1656, Progressive Casualty v. Liberty Mutual 15-1656, Progressive Casualty v. Liberty Mutual  15-1656, Progressive Casualty v. Liberty Mutual Thank you, Mr. Clark. Thank you. Mr. Myers. Thank you, Your Honor. May it please the Court. Progressive's arguments here are essentially a repeat of the arguments that they made at the oral hearing, and I recommend taking a look at the transcript. You'll see that it's almost exactly the same, and that's at A5084-5173. They're not entitled to a redo or a substitution or a mulligan. The question here is... I'm confused. I thought it's generally a good thing that litigants coming to this Court are making the same arguments they made below. The question presented is whether there's substantial evidence for the Board's findings, and that is not what Progressive is arguing. They're arguing for this Court to replace the Board's determination. There's no claim construction here, so this isn't de novo. They got the claim construction they asked for. The issue is whether or not the Federal Circuit will find that there is substantial evidence, a reasonable basis for the Board's fact findings, which leads to the conclusion of obviousness. And it is those fact findings that were made by the Board, which Progressive contests, in the same way they did before the Board.  So let's turn to what's the substantial evidence and why this Court should be satisfied that the Board did a good job. So the first thing that I would say, Your Honor, on this issue of Herod, let me give you a little bit of a background about that reference. What Herod did was it monitored a group of drivers' behavior in the United Kingdom. It determined their acceleration patterns and their speeds. And based on that, it grouped them into behavioral groups based on their acceleration and their speed. And it concluded that they could predict accident risk. The argument that Progressive makes here is essentially there's a disconnect between predicting accident risk and insurance loss. And there are several places where the Board disagrees. Let's turn to number one. The Paterson reference itself was a measure and a study which was done in acceleration patterns. And at A7135, and I'm going to read it just a portion of it. Can I just ask you, you started by saying the Board disagreed, and I was expecting to hear a citation to something in the Board decision. Where did the Board specifically? The Board specifically found that at A7041 that Herod disclosed to Oposita the use of actuarial classes and that it was related to expected loss at 7032-43. I have to stop you. There's too many different pagination numbers. I understand. And this is in the Bouchard one, which is appeal number 14-1656. And I've chosen Bouchard because it covers all the claims. So if you agree with 1656, the 970 patent claims are canceled. I'm sorry, so what was the page then in the Board decision in that one? It's in 7041, and then their surrounding discussions in 7032-43. Okay, thank you. And in particular references to Paterson at 7032-37. Now at 7135, what Paterson says is by the fact that the policyholders know that their driving pattern is being controlled and recorded, this will, and I'm dropping a few words, this will reduce driving speed, number of accidents, and consequently also the size of disbursements from the insurance companies. So the link between accidents and payments by the insurance company explicitly in the prior art reference at 7135. Second, the Florida Guide says that insurers charge on a non-discriminatory basis, but one of the basis they can charge on frequency of accidents. And that's at A7164. Now the 970 patent itself says you can create an actuarial class that's predictive of loss based on accident statistics, and that's A7039-43, column 1, lines 28-30. And then based on acceleration data using the claimed invention, and that is A7089, column 641. So the patent itself says you can use acceleration data to create an actuarial class. It says you can use accident statistics to get there. So it's not just Ms. O'Neill's testimony. I would add in addition to the paragraphs that were cited by the progressive in their argument that O'Neill's expert opinion, it paragraphs 21 and 22, and at 24, and that is A10607-08, makes the statement flat out that you take a look at the actuarial behavior, you put them into groups, that what you then do is determine the accidents, and with the accident information you can make predictions of loss and estimates. And in her rebuttal affidavit she says progressives submitted the actuarial statement of principles. And what I'm talking about doing, making estimates of future loss, is countenanced by the actuarial statement of principles, and that's exactly the job of an actuary, and that is in fact what the board picked up in their decision in A7041. So you have as a basis substantial evidence that Herod discloses an actuarial class that relates to insurance loss. You have Paterson, the Florida Guide, the 970 patent itself, both the old way of doing it, accident statistics in the first column, the background of the patent, and patterns of acceleration, which was what was used in Herod, using their new invention in column 6. And then you have O'Neill's expert opinion, and all of that information was the basis for the board's decision. Now what the board said ultimately, and with respect to Bouchard, was that given the high level of knowledge of Aposita, and the well-known principles and conventions of insurance, and the expert testimony of Liberty's expert, it was obvious that a person of ordinary skill in the art would do what the law required, and use nondiscriminatory actuarial classes based on an insurance profile with policy limits and deductibles to determine a base cost of insurance. That's at A7025 and at 26. It is also at A702022. And again, that's in the Bouchard final written decision. Now I'd like to turn from the examples, unless there are questions, from the Bouchard to Kosaka, because there are several issues, I think, with respect to Kosaka that deserve some further answer and commentary. The first is the issue of fuzzy logic. And let's turn for a second to that. The board determined two things. One, in both 35A and in 970, that fuzzy logic was well known for insurance. And that's A49 and 970, and A5036 and 37 in 35A. The board also said, excuse me, you don't even have to use fuzzy logic, because if you read Kosaka as a whole, which you should do, you should read the entire reference, it says you don't have to use fuzzy logic. You can use standard insurance lookup tables. That's in A51 and the 970. Is it right that neither the board in its institution decision nor you in your petition ever pointed to the specific passage about insurance tables in Kosaka and said, independent of fuzzy logic, that supplies the required element here? I would say absolutely yes, Your Honor, for the following reason. Prior art is presumed to be enabling. And what it was cited for to make a prima facie case in our petition was to show that Kosaka provided an insurance determination module with sensors on the vehicle that allowed you to make a real-time determination of insurance. The claim language in meeting the claim limitations was in no way related to fuzzy logic. Now what happened was Progressive came back and they said, wait a minute, because of fuzzy logic it won't work. And we said two things in response. One of them was, wait a minute, it was known to use fuzzy logic. And number two, fuzzy logic isn't even required. And at a procedural level, and a reason you should have some trust in the board. I'm sorry, Progressive in its patent on the response said fuzzy logic isn't required in Kosaka? No, no, I'm sorry. Liberty put that in their reply. In the reply, right. And the board agreed. What you need to know as a procedural matter is that Progressive took the depositions of the experts that supported those replies. They were entitled to submit observations and they did not make any motion to do a surreply. They had opportunities to make arguments on these points. Did they have a legal right to submit evidence as perhaps the APA in 556 would suggest they do? Yes. They did? They did. They had the opportunity, one, to make a transfer. After they heard about this? Right. They had the opportunity to cross-examine and depose, which they did. Submit their own? They then had the opportunity. I'm sorry, I think I get to, when I start talking, I think you need to stop and let me, because I sometimes speak a little slowly. I took it as a given that they did not have a right to submit their own new expert declarations, for example, about the factual question of what a relevant, skilled artisan would understand from the newly cited page of Kosaka. They don't as a matter of right, Your Honor. You're correct. They had the opportunity to cross-examine. They had an opportunity, our witnesses, they had an opportunity to make observations about it. They also had the opportunity to approach the board and ask for that opportunity to file expert declarations on the points, and they didn't do it. So they were unable, using cross-examination, they were unable through the observation process to make a dim in the testimony. And in addition, they made no effort to say, we need to have a certify. They didn't present their argument. So where would we be if they had asked for a certify and the board had declined to grant it? Your Honor, I can't predict how the board would have answered it going into the past, but the board has made it clear that if you have a reason for, out of fairness, to get a certify or present some evidence, they regularly allow it and they have over the several thousand cases that are ongoing before the court. Progressive didn't do it. Now I can't predict what would have happened if they had, but they certainly did cross-examine. They did file observations. They even moved to exclude. And the board considered and said, listen, you've got to take the reference as a whole, number one. Number two, you didn't, the issue of enablement here is something that didn't belong in the petition. And then the second piece of it is, this was all proper rebuttal and reply and you should have expected it. I find it difficult to believe that certifies are ever permitted if the board is acting as a firing squad and a death squad. Well, Your Honor, I don't believe that they are. So the board is interested, I believe, in establishing and maintaining a fair procedure. And I don't know if there are more questions about Kosaka. I'm glad to address them, or with respect to Bouchard and the 970. Well, your time is up. It's not quite, but it will be in 20 seconds. All right. Thank you, Your Honor. May it please the court. I'm going to focus on Progressive 1, as I refer to it. That's 1466. In particular, the issue of Kosaka. So when the board adjudicates under 328 the patentability question, it decides, based on the entirety of the record, whether or not those claims are unpatentable. In this particular instance, after a trial was instituted and everybody knew that Kosaka was on the table, Progressive filed a patent owner response that argued multiple things about why Kosaka was not a viable basis for unpatentability, including it's not enabled, it's not consistent with Herod's crisp logic. In the reply, Liberty filed responding declarations that explained why it was, and it pointed out that Kosaka itself undercuts the argument about fuzzy logic, because they're on the face of the document, is the teaching that you don't need to use it. What the APA and due process and everything else requires is that you have notice of the issues of fact of law to be adjudicated. It cannot be said in this case that Progressive did not know that this question about Kosaka and fuzzy logic wasn't on the table because they raised it. There are two questions about Kosaka and fuzzy logic. One is whether a skilled artisan would have known what the heck Kosaka was talking about. Enabled. Enabled. I'm not entirely sure those are the same thing, but let's assume that they're the same thing. The other is whether Kosaka taught not using fuzzy logic. That had not been part of the proceeding before. I took it as given that that proposition, that Kosaka did not require use of fuzzy logic, and a skilled artisan would have understood that, and taken a lesson from the non-fuzzy logic part of Kosaka to start getting motivated to combine things to make this obvious, that that just had not appeared in the proceeding until the reply that Liberty filed. Embedded in your question, Your Honor, is does the statute, the AIA trial statute, require that what the board says in the final written decision in explaining why the claims are or are not unpatentable have been articulated by the board before? And the answer is no. No, I don't think that was embedded. I think what under the APA 554 and probably 556 incorporates what I have trouble thinking of as a different substantive standard from the new ground of decision regulatory standard, that the gist or whatever the language is that is used has to be communicated so that the parties, A, know what they need to address, and B, have an opportunity to put on evidence, including on the factual question here, what Kosaka would mean to a relevant skilled artisan. So, Your Honor, that idea of thrust, the reason why the new grounds doctrine from the examinational model is just not compatible here, the thrust in that context is what did the examiner say before you got to the board for the board to serve its appellate function. This is an examinational model. So that the board, if it says something that goes beyond what the examiner said, which was supposed to be a locked-in basis for why your claims weren't unpatentable, they've exceeded their statutory authority under section six as an appellate body, and it goes back. Here, the thrust to borrow that language from the new grounds law doesn't come until the 328 decision. That's where the board explains, pursuant to its statutory mandate. Right, but I guess what I want to – I just want to be clear. It doesn't matter who gives the patentee the notice, whether it's the petitioner or the board. But if nobody gives the patentee the notice and the opportunity to address what is substantively a different point, there's a real fairness problem about its not having the opportunity to address it. Right, but here they did. That's a different – Final written decision without violating procedural rights. Well, in essence what you're saying is they can rely on the evidence before them. That's correct, Your Honor. And here in particular, and my friend articulated – I'm sorry. Even if nobody had made an assertion about that evidence? Your Honor – Sorry. What – I'm going to think. What 328 says – When you talk about the APA, I don't think 328 repeals the APA. No, it does not. But there's a relationship between the APA issues and 328. What the APA requires is that you have notice of the facts and law before you get to that hearing. And here, clearly the trial record had fleshed out this question of whether or not COSACA requires you to use fuzzy logic. It's on the face of COSACA. It's in the reply. My colleague mentioned some of the things that Progressive tried to do to eliminate that issue before it got to the oral hearing. The one actually they didn't talk about was perhaps maybe the most important one. They tried to exclude that particular material from the trial proceedings. That's to add. In the final written decision, the board adjudicates Progressive's motion to exclude, quote, what Liberty's expert relied upon, new portions of COSACA. It doesn't have to use fuzzy logic. That's an A64, and it rejected it. Notably, Progressive did not pursue an appellate review of that particular aspect of the board's final written decision. They had ample procedural protection on this particular issue. Do you agree with your friend that they should have or could have filed a motion to reconsider or whatever it is, so that they could have submitted new additional evidence if they thought it was necessary? Yes. I'm sorry, Your Honor. Yes, Your Honor. Certain replies are granted in these trials. I mean, under 425, 37 CFR 425, the board has wide latitude to craft how these proceedings move forward to accommodate the various interests. I mean, in some examples... Yeah, but can we be satisfied and guided by the logic that the board appreciates and understands the APA requirements that Judge Taranto is following, so that if they get a motion to supplement or to do a surreply, their evaluation consists of raising the questions about the fairness and the opportunity to respond and so forth? Is that the way this is done? Yes, Your Honor. I mean, for example, just to give an example. In one IPR, 2013, 00063, the board permitted a surreply on the question of anti-gating priorities. They gave the patent owner an example or the option to file a surreply to respond on the priority issue. I mean, there are examples across all of these IPRs and covered business method patents and PGRs. Suffice it to say, if the board is confronted with this particular issue and the board says, no, no surreply, that's an issue that this court can review because it ultimately flows into the 328 final written decision. But I think it is fair to say— Well, they did the cousin of a surreply. They moved to strike, and you've already acknowledged to us that they're not going to appeal a denial of motion to strike. Why isn't the same case of denying a surreply? Your Honor, I think that's—I recognize what you're saying. I think it's a long way of saying that there are multiple avenues available to a patent owner to pursue in these proceedings, some expressly enumerated in the regulations, some not but available to you to ask for. One that nobody's mentioned is the fact that pursuant to 42300B, the board can extend these proceedings by six months pursuant to the statutory authority in the AIA. That was not something they pursued. Maybe that's something they didn't ask for a rehearing of the final written decision. Did the regulation—whatever you cited, did that provide certain grounds for extending it over six months? It's good cause. Good cause, Your Honor. So this is all—and I apologize. I see I'm way past my time. But this is all a long way of saying there's any number of things that a party like Progressive can use. Some of them they did. Some of them they didn't, but are all sufficient to protect under the APA and the due process clause. Thank you. Thank you. Well, this is not moving on as rapidly as I had hoped, but here we are. I'll make this very short as I have very little time. We think that at the very least, these appeals should be remanded to the board for proper proceedings due to the late filing and late new grounds that were added both on the Herod reference in the change in the claim construction as well as the fuzzy logic in the common insurance table issue. If the board—or the court, on the other hand, decides that there is not sufficient substantial evidence to show that Herod has the so-called actuarial class of insurance relating to expected loss, that would be sufficient in itself, and I'll remand for a reversal. The same would be true in terms of Kosaka as it relates to the prepayment calculation. Are there no further questions? Thank you. Okay. Thank you. The case is submitted.